Filed 10/3/23  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F084165 |
| Plaintiff and Respondent, | (Super. Ct. No. CF01662053) |
| v. | |
| EDMUNDO ANTHONY RODRIGUEZ, | **OPINION** |
| Defendant and Appellant. | |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Heather Mardel Jones, Judge.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, Erin R. Doering and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

**INTRODUCTION**

Petitioner and appellant Edmundo Anthony Rodriguez appeals from the trial court's denial of his petition to vacate his second degree murder conviction and for resentencing under Penal Code section 1172.6 (formerly § 1170.95).[1, 2]  He argues the trial court erred in denying his petition without issuing an order to show cause and conducting an evidentiary hearing.  Petitioner contends he established a prima facie case for resentencing by alleging the jury could have been misled by the jury instructions regarding aiding and abetting, leaving open the possibility petitioner was convicted of second degree murder under an improper theory of *imputed* malice.

Assuming, without deciding the reasonable likelihood standard applies in this context, we conclude there is a reasonable likelihood the jury construed the instructions in the manner petitioner asserts, and because the record of conviction does not conclusively negate this reasonable likelihood, petitioner cannot be deemed ineligible for resentencing as a matter of law at the prima facie stage.  We reverse the trial court's order denying the petition, and remand for an evidentiary hearing.

**FACTUAL BACKGROUND**

**I.     Original Second Degree Murder Conviction**

In 2001, petitioner was charged, along with his half brother Ernesto, of murder in an unspecified degree under section 187, subdivision (a).  Enhancement allegations were attached to the murder charge alleging petitioner and Ernesto were principals in the commission of the murder and that, in the commission of that crime, at least one of the principals intentionally and personally discharged a firearm causing the death of the victim within the meaning of section 12022.53, subdivisions (d) and (e)(1) (vicarious

---

[1]     All statutory references are to the Penal Code unless indicated otherwise.

[2]     Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6. (Assem. Bill No. 200 (2021–2022 Reg. Sess.) (Assembly Bill 200).)  We refer to the statute herein by its present section number.

discharge allegation). It was also alleged the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang under section 186.22, subdivision (b)(1). Finally, with respect to petitioner only, it was alleged he personally and intentionally discharged a firearm causing the death of the victim under section 12022.53, subdivisions (d) and (e)(2).

Petitioner and Ernesto were tried jointly, and the jury found them both guilty of second degree murder. The allegation that petitioner personally and intentionally discharged a firearm was found not true; the street gang enhancement and the vicarious discharge of a firearm enhancement were found true. Petitioner appealed, and we set forth the original factual summary in our opinion on petitioner's direct appeal, but we do so for the purpose of context only.[3]

> "On May 30, 2001, between 6:00 and 6:30 p.m., members of rival street gangs—the Eastside Fresno Bulldogs and Northside Six Deuce Diamond Crips—exchanged insults and provocative looks in the courtyard of an apartment complex in Fresno. [Petitioner] and Ernesto were members of the Bulldogs and active participants in gang activities. Maurice Woods, a member of the Crips, ran from the breezeway of an apartment toward Ernesto. A fight broke out. Ernesto was beaten unconscious and taken to an apartment belonging to a fellow Bulldogs member.
>
> "Later that same evening, [petitioner], Ernesto, and other individuals were seen outside, angry and making references to revenge. The group believed Woods had run out from an apartment belonging to Travone Polk, who was not a gang member. Although there was information to the contrary, the Bulldogs were under the impression that Polk had somehow assisted Woods or the Crips in the earlier fight. [M.A.], Polk's niece who lived with him, was warned of retaliatory attacks against Polk.
>
> "At approximately 12:30 a.m. on May 31, 2001, [petitioner], Ernesto, and another individual entered Polk's apartment. [M.A.] and Polk

---

[3] Petitioner filed a request for judicial notice of the record on appeal in case No. F040241, which was granted. The facts stated in our prior appellate opinion are set forth only for contextual reference as we consider the issues petitioner raises. (See *People v. Flores* (2022) 76 Cal.App.5th 974, 988 [factual summary in appellate opinion not evidence that may be used to establish, as a matter of law, a petitioner's ineligibility for resentencing at the prima facie stage].)

were inside the apartment and heading outside to sit on the stairway. After a brief struggle, Polk was shot and killed. [Petitioner], Ernesto, and another individual were seen fleeing the scene.

"A street gang expert testified that respect 'is everything to a gang member.' He testified that taunting is a form of disrespect and may provoke fights between gangs. Retaliatory action, ranging from another fight to a shooting, is expected if a gang member is knocked out by a rival gang member during a fight. A non-gang member, who is perceived by the disrespected gang to have somehow assisted the opposing gang, may be the target of the retaliatory action. Further, the retaliatory action is not necessarily proportional to the disrespectful act. [¶] … [¶]

"[Petitioner] testified in his own defense that he had been drinking, to the point of intoxication, on May 30, 2001. He claimed he spent the night at [M.J.]'s house and had gone to bed between 10:30 and 11:00 p.m.

"[Petitioner] challenged the reliability and accuracy of the eyewitnesses' identification. An expert on witness identification testified regarding the various factors that affect the reliability of eyewitness identifications. He opined that this case presented many factors weighing against the reliability of the identifications.

"Ernesto presented the testimony of another gang expert who testified that when a shooting is retaliatory, the gang members will generally make it known that it is gang-related. For instance, a Bulldogs member may bark as a signal. The expert further noted that Polk was shot in the buttocks and suggested that Polk may have molested a female gang member who retaliated by shooting and killing him."

**Petition For Resentencing**

In September 2020, petitioner, acting in pro. per., filed a petition for resentencing under section 1172.6. The People filed an opposition brief in November 2020. The trial court appointed counsel for petitioner in December 2021. Petitioner refiled his petition in January 2022, which the trial court considered "fundamentally identical" to the September 2020 petition, and the trial court thus considered the People's opposition to the original petition without another statement of opposition. No reply brief was filed.

4.

The trial court concluded petitioner failed to make a prima facie showing under section 1172.6 that he is eligible for resentencing. The trial court determined the theory of guilt at trial did not rely on felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime. Specifically, the jury was never instructed on, and thereby could not have found guilt based on felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed based solely on that person's participation in a crime. The trial court also noted petitioner was more than a mere participant in the crime as he was found to be a principal and a direct aider and abettor of the murder acting with express or implied malice.

## DISCUSSION

On appeal, petitioner argues the trial court erred in dismissing his petition without an evidentiary hearing.

I.    **Applicable Law**

A.    **Senate Bill No. 1437 and Senate Bill No. 775**[4]

Effective January 1, 2019, the Legislature passed Senate Bill 1437, which "eliminated natural and probable consequences liability for murder as it applies to aiding and abetting, and limited the scope of the felony-murder rule." (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) Senate Bill 1437 added three separate provisions to the Penal Code.

"First, to amend the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e): 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the

---

**4**    Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437).
Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775).

5.

following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' …

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) (section 188(a)(3)):  'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.'

"Third, Senate Bill 1437 added [former] section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843.)  Under this section, "the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met ([§ 1172.26], subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

Effective January 1, 2022, the Legislature passed Senate Bill 775, which "expanded the scope of those changes to encompass, among other things, murder convictions 'under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime.*'" (*People v. Langi* (2022) 73 Cal.App.5th 972, 978 (*Langi*).)  Assembly Bill 200 subsequently renumbered section 1170.95 to section 1172.6, effective June 30, 2022.

**B.    Section 1172.6**

To seek relief under section 1172.6, a petitioner must file a petition in the superior court averring that:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*[;]  [¶]  (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]  [¶]  (3) *The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019*."  (*Id.*, subd. (a)(1)–(3), italics added; see *id.*, subd. (b)(1)(A).)

If a petition fails to comply with these requirements, "the court may deny the petition without prejudice to the filing of another petition .…"  (§ 1172.6, subd. (b)(2).)  If the petition complies with subdivision (b)'s requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made "a prima facie showing" for relief.  (*Id.*, subd. (c).)

"After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief.  If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause.  If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so."  (§ 1172.6, subd. (c).)

If an order to show cause is issued, "the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as

7.

if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.…"  (§ 1172.6, subd. (d)(1).)

## II.    Standard of Review

In this case, the trial court denied petitioner's petition at the prima facie stage under section 1172.6, subdivision (c).  A denial at this stage is appropriate only if the petitioner is ineligible for relief as a matter of law.  (*Strong, supra*, 13 Cal.5th at p. 708; *Lewis, supra*, 11 Cal.5th at p. 960.)  "A petitioner is ineligible for resentencing as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that (1) the petitioner was the actual killer, or (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life, or (4) the petitioner acted with malice aforethought that was not imputed based solely on participation in a crime."  (*People v. Lopez* (2022) 78 Cal.App.5th 1, 14.)  This is solely a legal conclusion that we review de novo.  (See *Lewis, supra*, at p. 961.)

## III.    Instructional Challenge

To directly aid and abet implied malice murder, "'[t]he mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'"  (*People v. Reyes* (2023) 14 Cal.5th 981, 991 (*Reyes*).)

Petitioner's challenge centers primarily around how the jury was instructed on these principles under CALJIC No. 3.01 (relating to aiding and abetting) and CALJIC No. 8.31 (relating to implied malice murder).  In relevant part, those instructions were given in this case as follows:

8.

"A person aids and abets the commission of a crime when he, [¶] 1. Wth knowledge of the unlawful purpose of the perpetrator and [¶] 2. With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] 3. By act or advice aids, promotes, encourages or instigates the commission of the crime .…" (CALJIC No. 3.01.)

"Murder of the second degree is also the killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2.. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct rest of such an act, it is not necessary to prove that a defendant intended that the act would result in the death of a human being." (CALJIC No. 8.31.)

## IV.     Scope of Section 1172.6

Petitioner argues ambiguity in the aiding and abetting instruction under CALJIC No. 3.01 in the context of implied malice murder may have confused the jury and caused them to convict him of second degree murder under an impermissible theory of *imputed* implied malice based solely on his participation in the crime. Specifically, the aiding and abetting instruction required that the aider and abettor knowingly and intentionally aid and abet the commission of *the crime*, which, in this case, was murder. Yet, in the context of implied malice murder, which the jury was instructed on, neither the direct perpetrator nor the aider and abettor had to act with an intent to kill.

Relying on *Langi*, petitioner asserts there is a possibility the jury could have construed the aiding and abetting instruction with the implied malice murder instruction to mean the aider and abettor must knowingly and intentionally aid and abet only the commission of the life-endangering act the direct perpetrator intended to commit. Under this construction, the jury would have convicted petitioner of second degree murder without finding he personally harbored any malice. Given this possibility, petitioner maintains he has made a prima facie showing that he was convicted under a theory under which malice was imputed to him based solely on his participation in the crime, and the

9.

trial court erroneously dismissed his petition at the prima facie stage without ordering an evidentiary hearing.

In light of this argument and petitioner's underlying conviction, petitioner's ability to make a prima facie showing is conditioned upon showing (1) a charging document allowed the prosecution to proceed pursuant to a theory under which malice was imputed to petitioner based solely on petitioner's participation in a crime (§ 1172.6, subd. (a)(1)); (2) petitioner was convicted of murder following a trial (*id.*, subd. (a)(2)); and (3) petitioner could not presently be convicted of murder because of changes to sections 188 or 189 made effective January 1, 2019 (§ 1172.6, subd. (a)(3)).

The People argue petitioner cannot make the showing required under section 1172.6, subdivision (a)(3). The People point out Senate Bill 1437 did not affect direct aider and abettor liability for implied malice murder. Direct aiding and abetting of an implied malice murder remains viable after Senate Bill 1437 (*Reyes, supra*, 14 Cal.5th at p. 990), and both before and after Senate Bill 1437, a direct aider and abettor had to act with malice—either implied or express—to be liable for murder (see *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*); *People v. Gentile, supra*, 10 Cal.5th at p. 850). Even if petitioner is correct about the instructional ambiguity, the People maintain he cannot show that he could not presently be convicted of murder or attempted murder "*because of* changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3), italics added.) The People contend section 1172.6 is not a procedural vehicle to remedy trial errors that petitioner could have, but did not, address on direct appeal.

In *Strong*, the California Supreme Court resolved a split among the Courts of Appeal involving a similar argument about the scope of section 1172.6, subdivision (a)(3)'s "'because of'" language. (*Strong, supra*, 13 Cal.5th at pp. 709–712.) The high court explained, this "'because of' language does not require a showing that a

10.

claim to relief under Senate Bill 1437 arises from *no other* cause—only that the 2019 changes [to the law] supply a basis for the claim and so are *a* cause." (*Id.* at p. 712.)

In 2019, under Senate Bill 1437, section 188 was amended, in relevant part, to state "Malice shall not be imputed to a person based solely on his or her participation in a crime." Consistent with section 188, section 1172.6 was expanded in 2022 beyond those convicted of felony murder or murder under the natural and probable consequences to include those convicted of murder under a theory "under which malice is imputed to a person based solely on that person's participation in a crime …." (§ 1172.6, subd. (a)(1).) As petitioner has identified an instructional ambiguity theory under which malice may have been improperly imputed to him based solely on his participation in a crime, the changes to the law in 2019 supplied at least *a* basis for his claim for resentencing under section 1172.6, regardless that he could have raised this issue on direct appeal of his 2001 murder conviction. (*Strong, supra*, 13 Cal.5th at p. 712.)[5]

The People do not address *Strong*, and, based on the arguments presented, we are currently disinclined to conclude the changes in the law under Senate Bill 1437 did not supply at least *a* basis for petitioner's instructional claim for purposes of section 1172.6, subdivision (a)(3).

---

[5] Moreover, as noted in *Langi*, although Senate Bill 1437 did not alter the law regarding the criminal liability of direct aiders and abettors of murder, "there was 'a dearth of decisional law on aiding and abetting implied malice murder,' attributable to 'the heretofore availability of the natural and probable consequences doctrine for second degree murder,' which was 'much easier to prove … than … direct aider and abettor liability for an implied malice murder.' ([*People v.*] *Powell* [(2021)] 63 Cal.App.5th [689,] 711, fn. 26.) *Powell* clarifies the precise elements of directly aiding and abetting a second degree implied-malice murder, and points out that the use of an untailored, standard aiding-and-abetting instruction fails to convey those elements. (*Id*. at pp. 712–714.) "Thus, while Senate Bill No. 1437 did not alter the law regarding direct aiding and abetting of second degree murder, it did bring out the inadequacy of standard aiding-and-abetting instructions in this context." (*Langi, supra*, 73 Cal.App.5th at p. 982, fn. 10.)

## V. Aiding and Abetting Instructional Ambiguity

Petitioner's ambiguity argument relies on a line of cases beginning with *Powell*, which was a direct appeal that involved a claim of ambiguity in the pattern instruction for aiding and abetting in the context of second degree implied malice murder. *Powell* was subsequently extended in the section 1172.6 context by the First District Court of Appeal in *Langi* and *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*). To frame the parties' arguments about these cases and whether and how they should be applied here, we begin by briefly describing these courts' reasoning and holdings that pattern aiding and abetting instructions are ambiguous in the context of implied malice murder.[6]

### A. *Powell*, *Langi* and *Maldonado*

Our high court has explained that "[a]ider and abettor liability is premised on the combined acts of all the principals, *but on the aider and abettor's own mens rea*." (*McCoy, supra,* 25 Cal.4th at p. 1120, italics added.) A direct aider and abettor of murder must act with malice—the mental state of the perpetrator is not imputed to the aider and abettor. (*Ibid.*)

"'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting

---

[6] *Powell* and *Maldonado* considered the CALCRIM series of instructions, while *Langi* considered the CALJIC series. (*People v. Powell* (2021) 63 Cal.App.5th 689, 714 (*Powell*); *Maldonado, supra*, 87 Cal.App.5th at p. 1264; *Langi, supra*, 73 Cal.App.5th at pp. 982–983.)

12.

in conscious disregard for human life.'" (*Reyes, supra*, 14 Cal.5th at p. 991, quoting *Powell, supra*, 63 Cal.App.5th at p. 713.)

In *Powell*, a group of four men broke into the victim's house, seeking retaliation for an altercation earlier in the evening. (*Powell, supra*, 63 Cal.App.5th at pp. 691–692.) Two of the men, Powell and Langlois, and possibly a third man, J.D., beat the victim and the four men fled the home. (*Id.* at p. 692.) The victim sustained three stab wounds, one of which was fatal, and a number of blunt force injuries to his body. (*Id.* at p. 699.) Powell and Langlois were tried together for murder, with the prosecution asserting Powell inflicted the fatal stab wound and that Langlois could be guilty of murder by directly aiding and abetting express malice murder and guilty under indirect theory of liability for the natural and probable consequences of the assault Langlois aided and abetted. (*Id.* at p. 708.) A jury found Powell and Langlois guilty of second degree murder, first degree burglary, and found that Powell had personally used a deadly weapon. (*Id.* at p. 692.)

Langlois argued on appeal that the language of the standard aiding and abetting instruction under CALCRIM No. 401 couched direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*. (*Powell, supra*, 63 Cal.App.5th at p. 714.) The court observed that an aider and abettor of implied malice murder need not intend the commission of the crime of murder. (*Ibid.*) "Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Ibid.*) The court concluded that because the aiding and abetting instruction was not tailored for implied malice murder, the jury instructions were erroneous. (*Ibid.*)

13.

Extending *Powell* in the section 1172.6 context, the First District Court of Appeal, Division Four, concluded in *Langi* that the substantially identical aiding and abetting instruction under CALJIC No. 3.01 was ambiguous in the context of implied malice murder. (*Langi, supra*, 73 Cal.App.5th at pp. 981–983.) In that case, the defendant and three other men beat a victim who died from head trauma after falling and hitting his head during the assault; it was not clear who threw the fatal punch. (*Id*. at pp. 976–977.) The prosecutor argued the victim was killed during a robbery, and urged the jury to convict the defendant of felony murder. (*Id*. at p. 977.) The defendant's jury was not instructed on the natural and probable consequences doctrine, but was instructed on aiding and abetting under CALJIC No. 3.01 and on second degree murder under CALJIC No. 8.31. (*Langi, supra*, at p. 981.) The jury found the defendant guilty of second degree murder, and the conviction was affirmed on direct appeal in 2009. (*Id*. at pp. 976, 977.) After the enactment of Senate Bill 1437, the trial court summarily denied the defendant's section 1172.6 petition at the prima facie stage. (*Langi, supra*, at p. 977.)

The appellate court reversed, holding that the defendant was entitled to an evidentiary hearing because the jury instructions permitted him to be found guilty of directly aiding and abetting second degree murder under an impermissible theory of imputed malice. (*Langi, supra*, 73 Cal.App.5th at p. 984.) *Langi* explained the aiding and abetting instruction under CALJIC No. 3.01 stated that a person aids and abets a crime if the person acts with knowledge of the perpetrator's unlawful purpose and with the intent or purpose to commit or encourage the crime, but the implied malice murder instruction under CALJIC No. 8.31 directed the jury that a perpetrator of that crime need not act with an unlawful intent of causing death. (*Langi, supra*, at pp. 981–982.) The court reasoned that under these instructions, the jury could have concluded the direct perpetrator's unlawful purpose in beating the victim was only to strike, injure or embarrass the victim—not to kill. (*Id*. at p. 982.) Because the perpetrator's unlawful purpose need not have been to kill the victim, the aider and abettor's knowledge of that

14.

purpose similarly need not have been that the perpetrator aimed to kill. (*Ibid*.) As a result, the court reasoned, a jury could have concluded all the aider and abettor had to intend was the perpetrator's unlawful purpose—the intentional life-endangering act. (*Id*. at pp. 982–983.) Thus, the instructions entitled the jury to conclude that to be guilty of implied malice murder as a direct aider and abettor, the aider and abettor needed only to intentionally encourage the perpetrator's intentional act. (*Id*. at p. 983.) As such, the instruction should have been tailored to state that to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice. (*Ibid*.)

The appellate court concluded that because the record did not conclusively negate the possibility the jury found the defendant guilty of second degree murder by imputing to him the implied malice of the actual killer without finding that he personally acted with implied malice, an evidentiary hearing was required. (*Langi, supra*, 73 Cal.App.5th at p. 984.)

In *Maldonado*, Division Five of the First District Court of Appeal applied *Langi*'s reasoning in the context of aiding and abetting lying-in-wait murder. (*Maldonado, supra*, 87 Cal.App.5th at p. 1266.) Like second degree implied malice murder, lying-in-wait first degree murder does not require the intent to kill. (*Id*. at p. 1262.) Rather, "'[i]f the act which the perpetrator intends to commit while lying in wait results in a killing which satisfies the elements of murder, it is immaterial whether the perpetrator intended to kill ….'" (*Ibid*.) *Maldonado* reasoned that, much like the situation in *Langi* where the aider and abettor may have known of and intended only to facilitate the perpetrator's intentional act of assault and not the resulting killing of the victim, the aider and abettor of lying-in-wait murder may have known of and intended only to facilitate the perpetrator's intentional act of a surprise attack on the victim absent any intent to kill. (*Maldonado, supra*, at p. 1266.)

15.

*Maldonado* reasoned the jury could have misconstrued the instructions "such that, 'to be guilty as an aider and abettor of [lying in wait first degree] murder, [the] appellant need only have intended to encourage the perpetrator's intentional act—in this case, [a surprise attack on the victim]—whether or not [the] appellant intended to aid or encourage [the victim's] killing, and whether or not he personally knew of and disregarded the risk of such a killing.'" (*Maldonado, supra*, 87 Cal.App.5th at p. 1266, quoting *Langi, supra*, 73 Cal.App.5th at p. 983.)  In view of the ambiguous instructions, the appellate court was unable to "say the record conclusively establishes [the defendant] is ineligible for relief [under section 1172.6]." (*Maldonado, supra*, at p. 1269.)

## B.  Analytical Framework For Assessing Ambiguity

Before taking up the issue of whether an ambiguity in the aiding and abetting instruction allowed the prosecution to proceed on, and the jury to convict petitioner of murder under, an impermissible theory of imputed malice based solely on his participation in a crime, the parties dispute how the existence of an instructional ambiguity should be assessed in this context.

The People argue we must apply the "reasonable likelihood" standard that is utilized to determine whether jury instructions caused the jury to misapply the law in the direct appeal context.  (*Boyde v. California* (1990) 494 U.S. 370, 380; *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4, accord, *People v. Mitchell* (2019) 7 Cal.5th 561, 579; see *Calderon v. Coleman* (1998) 525 U.S. 141, 146 ["constitutional error exists only if 'there is a reasonable likelihood' that the jury so interpreted the instruction"].)  In section 1172.6 proceedings at the prima facie stage, the People contend, the prosecutor could not have proceeded on an impermissible theory if there is no *reasonable likelihood* the jury understood the instructions to present such an impermissible theory.  *Langi*, the People assert, relied on an *any possibility* standard, which the People contend was incorrect and inconsistent with the Supreme Court's observation in *Strong* that the

Legislature did not intend to "permit wholesale relitigation of findings supporting murder convictions .…" (*Strong, supra*, 13 Cal.5th at p. 715.)

Petitioner, on the other hand, relies on *Langi* and argues that so long as the record of conviction does not conclusively negate any possibility the jury found defendant guilty of second degree murder by imputing malice, then he has made a prima facie showing of eligibility for resentencing and he is entitled to an evidentiary hearing. (See *Langi, supra*, 73 Cal.App.5th at pp. 983–984 [aiding and abetting instruction allowed the jury to convict under direct aiding and abetting theory without any finding of malice, and because the record did not conclusively negate the possibility the jury did so, an evidentiary hearing was required].)

We recognize that some courts have referenced or expressly relied upon the "reasonable likelihood" standard when assessing instructional ambiguity presented at the prima facie stage under section 1172.6. (*See*, e.g., *People v. Estrada* (2022) 77 Cal.App.5th 941, 947–948 [referencing the reasonable likelihood standard in concluding jury would not have imputed malice to the petitioner based on purported ambiguity in CALCRIM No. 400].) Yet, we have lingering doubts the "reasonable likelihood" standard for measuring instructional ambiguity in the direct appeal context is wholly suitable at the prima facie stage of section 1172.6 proceedings.

On the one hand, "the prima facie inquiry under [section 1172.6,] subdivision (c) is limited" (*Lewis, supra*, 11 Cal.5th at p. 971), and the threshold for establishing a prima facie case for resentencing is "'very low'" (*id.* at p. 972). It does not involve any factfinding or weighing of evidence. (*Ibid.*.) An evidentiary hearing is required unless the record *conclusively establishes* the petitioner is ineligible for resentencing as a matter of law. (*Strong, supra*, 13 Cal.5th at pp. 708–709.) Although the "reasonable likelihood" standard does not mean more likely than not (*Boyde v. California, supra,* 494 U.S. at p. 380), it has parallels to harmless error analyses (*id.* at p. 393 (dis. opn. of Marshall, J.))

17.

and is not necessarily perfectly suited for making a conclusive determination as a matter of law.

On the other hand, there must be some analytical structure to assess an allegation that instructional ambiguity may have led the jury to convict a petitioner of murder under a theory whereby malice is imputed to a person based solely on his or her participation in a crime. In this regard, the People's criticism of the "any possibility" standard is warranted. If a prima facie showing may be made by alleging the mere *possibility* a jury misconstrued or misapplied the instructions to convict the petitioner under an impermissible theory of imputed malice, this would encompass every type of theoretical possibility from the improbable to the patently absurd. An allegation based on a mere possibility might require presuming the jury acted unintelligently, was unable to correlate instructions, construed the instructions in an entirely unreasonable manner, or simply chose not to follow the instructions given. (Cf. *Samia v. United States* (2023) 599 U.S. __, __ [143 S.Ct. 2004, *2014] [jurors are credited with being able to comprehend and follow the instructions of the court, and to "make unnecessary exceptions to [this presumption] 'would make inroads into th[e] entire complex code of … criminal evidentiary law, and would threaten other large areas of trial jurisprudence"].)

Such conduct by the jury is always *possible* in an abstract sense and difficult to conclusively negate, but presuming so is contrary to the general presumptions underpinning our jury system. (See generally *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9 ["[We] presume[] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them."].) Embracing a standard that may have the effect of casting aside those presumptions and/or permits all manner of speculation untethered to any facts is unworkable. In light of these concerns, there must be a basis in fact and reason, beyond speculation or mere possibility,

to allege the prosecution proceeded under a theory of imputed malice for which the jury was permitted to convict the petitioner of murder.

For these reasons, we are disinclined to read *Langi* as holding that a prima facie showing under section 1172.6 is established if there is *any* possibility (no matter how remote, improbable or absurd), which cannot be conclusively negated, that the jury construed the instructions to permit conviction for murder under a theory of imputed malice. (*Langi, supra*, 73 Cal.App.5th at p. 984.) *Langi* reviewed the full text of the jury instructions given in considering the parties' arguments (*id.* at p. 982), concluded the aiding and abetting instruction was ambiguous in the implied malice murder context (*ibid.*), and reasoned the jury was "entitled to conclude" the aiding and abetting instruction permitted conviction without a finding the aider and abettor personally harbored the requisite mental state for second degree implied malice murder (*id.* at p. 983). As the record of conviction did not conclusively negate this possibility, an evidentiary hearing was required. (*Id.* at p. 984.) At a minimum, we view this reasoning to implicitly indicate, considering the instructions as a whole, there must be an ascertainable instructional ambiguity from which a *reasonable* jury (acting under all the general presumptions regarding jury conduct) *could* have misapplied the aiding and abetting instruction to convict the petitioner without concluding the aider and abettor personally acted with malice.

Whether this less stringent formulation of the reasonable likelihood standard is what *Langi* intended to convey and/or is more appropriate in the section 1172.6 prima facie context than the reasonable likelihood standard may be debatable, but a standard based around *any possibility* is untenable. Nevertheless, whatever hesitation we may have about applying the reasonable likelihood standard in this context, we do not need to resolve the issue because, for reasons we will explain, that standard is satisfied here.

19.

### C. Instructional Ambiguity

Moving to petitioner's assertion of ambiguity, the petitioner argues, by relying on *Powell* and *Langi*, the instructions permitted the jury to find him guilty of aiding and abetting second degree murder if it found the killing resulted from the actual killer's intentional act, and petitioner knowingly and intentionally aided this intentional act without respect to whether petitioner personally harbored any malice.

The People maintain this interpretation of the instruction is unreasonable and argue *Powell* and *Langi* were wrongly decided. The People argue CALJIC No. 3.01 unambiguously informs the jury the aider and abettor must share the same mental state as a direct perpetrator of *the crime*, and the crime at issue is murder, which the jury was instructed could be committed with express or implied malice. Thus, to *knowingly* aid and abet a murder, the jury would have understood the perpetrator's *unlawful purpose* known to the aider and abettor had to amount to *at least* implied malice, and to *intentionally* aid and abet the commission of any degree of murder, the aider and abettor had to share this minimum mental state of implied malice with the perpetrator.

The People present *an* interpretation of the instructions whereby the jury would have necessarily found petitioner personally harbored malice, but there remains a reasonable likelihood the jury misunderstood the aiding and abetting instruction in the manner petitioner asserts and did *not* necessarily find petitioner personally acted with malice in convicting him of murder. Due to the ambiguity in the aiding and abetting instruction, it cannot be *conclusively established* petitioner is ineligible for resentencing as a matter of law. We note the jury's verdict clearly reflects it found that petitioner was a principal in the shooting. And, given the facts of this case, it may be highly likely the jury would have found those who aided and abetted the shooter to have personally acted with implied malice, but this strays into factfinding and weighing the evidence, which is not permitted at the prima facie stage.

20.

To explain this conclusion, we begin with the theories of murder presented to the jury, and the relevant instructional charges given.

### 1.      Theories of Murder and Jury Instructions

Petitioner and his half brother, Ernesto, were tried together on the sole charge of murder.  The prosecutor advanced three theories in closing arguments:  first degree premeditated murder, express malice second degree murder, and implied malice second degree murder.  As to each theory, the prosecutor argued all the principals in the apartment were guilty as either the shooter or as a direct aider and abettor of the shooter.  Neither the jury instructions nor the prosecutor's theory of the case included or relied upon felony murder or the natural and probable causes doctrine.  The prosecutor argued petitioner was the shooter, but he also argued petitioner could be convicted of first or second degree murder as a direct aider and abettor even if he was not the shooter.

Based on these theories, the jury was instructed in relevant part as follows:

### Murder—Defined (CALJIC No. 8.10)

"The defendants are accused in Count One of having committed the crime of murder, a violation of Penal Code section 187.

"Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder in violation of section 187 of the Penal Code.

"In order to prove this crime, each of the following elements must be proved:

"1.      A human being was killed; and

"2.      The killing was done with malice aforethought."

### Malice Aforethought—Defined (CALJIC No. 8.11 in relevant part)

"'Malice' may be either express or implied.

"Malice is express when there is manifested an intention to kill a human being.

"Malice is implied when:

21.

"1.    The killing resulted from an intentional act,

"2.    The natural consequences of the act are dangerous to human life, and

"3.    The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.  [¶]  When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought."

**Second Degree Murder—Killing Resulting From Unlawful Act Dangerous to Life**
**(CALJIC No. 8.31)**:

"Murder of the second degree is also the killing of a human being when:

"1.    The killing resulted from an intentional act,

"2.    The natural consequences of the act are dangerous to human life, and

"3.    The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

"When the killing is the direct result of such an act, it is not necessary to prove that a defendant intended that the act would result in the death of a human being."

**Aiding and Abetting—Defined**
**(CALJIC No. 3.01 in relevant part)**:

"A person aids and abets the commission of a crime when he,

"1.    With knowledge of the unlawful purpose of the perpetrator and

"2.    With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and

"3.    By act or advice aids, promotes, encourages or instigates the commission of the crime."

The jury convicted petitioner and Ernesto of second degree murder, but found not true the allegation petitioner personally and intentionally discharged a firearm proximately causing the death of the victim under section 12022.53, subdivision (d).

## 2. Analysis

As already noted, "[a]ider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea." (*McCoy, supra*, 25 Cal.4th at p. 1120.) "'To prove that a defendant is an accomplice … the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." ([*People v. Beeman* (1984) 35 Cal.3d 547,] 560, italics in original.) When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid.*)' (*People v. Prettyman* [(1996)] 14 Cal.4th [248,] 259.)" (*Id.* at p. 1118, fn. omitted.)

As outlined in *Powell* and reiterated by our high court in *Reyes*, to be liable for second degree implied malice murder, an aider and abettor must (1) have knowledge the perpetrator intended to commit the life-endangering act; (2) intend to aid the perpetrator in the commission of this act; (3) have knowledge the act is dangerous to human life; and (4) act in conscious disregard for human life. (*Powell, supra*, 63 Cal.App.5th at p. 713; *Reyes, supra,* 14 Cal.5th at p. 991.)

Turning to CALJIC No. 3.01, which sets out the requirements for aiding and abetting liability, there are three divergent paths a jury could take in construing this instruction in the context of implied malice murder. Petitioner adheres to *Langi*'s interpretation. *Langi*, as well as *Maldonado*, indicates the instruction is reasonably susceptible to the following interpretation: because the unlawful purpose of the direct

perpetrator might not include the intent to kill, then the jury would understand the aider and abettor's "knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill." (*Langi, supra*, 73 Cal.App.5th at p. 982; accord, *Maldonado, supra*, 87 Cal.App.5th at p. 1266.) As a result, the jury could have understood the aiding and abetting instruction to mean the aider and abettor could be found guilty of second degree implied malice murder if (1) the killing resulted from the direct perpetrator's intentional life-endangering act; (2) the aider and abettor aided and abetted that intentional act; and (3) the direct perpetrator deliberately performed the act with knowledge of the danger to, and with conscious disregard for, human life *whether or not the aider and abettor personally knew of and consciously disregarded the risk to human life*. (*Langi, supra*, at p. 983; *Maldonado, supra*, at p. 1266.)

As we understand the reasoning of these courts, the risk of such an interpretation arises if the jury construes knowledge of the perpetrator's *unlawful purpose* to be knowledge of the intentional, life-endangering act the perpetrator intends to commit, but not necessarily knowledge *the perpetrator knows* the act is dangerous to human life and acts with conscious disregard for human life. If the jury understands the aider and abettor's knowledge of the perpetrator's *unlawful purpose* is only the intentional life-endangering act, then it would be possible for the aider and abettor to intentionally aid the commission of that *act* without being subjectively aware of the risks to human life.[7] As the aiding and abetting instruction does not explain the aider and abettor has to personally harbor implied malice, a jury could believe that to aid and abet second degree implied

---

**7** If the aider and abettor knows the perpetrator has subjective knowledge of the danger to life the act poses and acts with conscious disregard of that danger, then, necessarily, to have knowledge of that state of mind in someone else, the aider and abettor has to personally understand the danger to human life. Then, by *intentionally* aiding and abetting the commission of the perpetrator's life-endangering act, the aider and abettor acts with conscious disregard for human life.

malice murder, the aider and abettor need only intend to encourage the perpetrator's intentional act.

To arrive at this interpretation, though, requires more than the jury construing the *unlawful purpose* phrase in this manner. The jury would also have to construe the instruction's reference to *the crime* as the *intentional life-endangering act* that the aider and abettor knew the perpetrator intended to commit. Specifically, in addition to the knowledge of the perpetrator's unlawful purpose, CALJIC No. 3.01 states the aider and abettor must, by act or advice, aid, promote, encourage or instigate the commission of *the crime* with the intent or purpose of committing or encouraging or facilitating the commission of *the crime*. Where, as here, the charged crime is murder, the instruction reads the aider and abettor must aid and abet *murder* with the intent or purpose of committing or encouraging or facilitating the commission of *murder*. That, however, indicates the aider and abettor intends the commission of the unlawful killing, but the implied malice murder instruction under CALJIC No. 8.31 states the killing does not have to be intended. Given that duality, a jury may read the instruction's reference to *the crime* and replace it with the intentional act of the perpetrator. Once reference to *the crime* is understood as *the intentional act* of the perpetrator, all the elements that comprise *the crime*, including the required mental state, are no longer implicitly referenced when the instruction describes what the aider and abettor must intend. Under that interpretation, the instruction reads only that the aider and abettor must knowingly and intentionally aid and abet the commission of the perpetrator's *intentional act*, without any requirement the accomplice must have acted with the mental state for *the crime*. (*Langi, supra*, 73 Cal.App.5th at p. 983; *Maldonado, supra*, 87 Cal.App.5th at p. 1266.)

This reading of the instruction by *Langi* and *Maldonado* is grounded in part in *Powell*'s observation the aiding and abetting instruction's reference to *the crime* is problematic because an "aider and abettor of implied malice murder need not intend the commission of *the crime* of murder …, he or she need only intend the commission of the

perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Powell, supra,* 63 Cal.App.5th at p. 714.)

Yet, while *Powell* seems to support the potential misinterpretation of the instruction *Langi* and *Maldonado* articulate, it also implicates another interpretation whereby the jury does *not* construe the aiding and abetting instruction's reference to *the crime* to mean the perpetrator's intentional act. Instead, when the instruction's reference to *the crime* is replaced with *murder* (which, here, is the sole crime at issue), the instruction reads that the aider and abettor must knowingly aid and abet the commission of *murder* with the intent or purpose of facilitating the commission of *murder*. "Murder by any commonsense definition is a form of killing … it is impossible to intend to commit a murder without intending to kill." (*People v. Coleman* (1989) 48 Cal.3d 112, 139 (*Coleman*).)[8] Interpreting the instruction this way, a jury could understand (incorrectly) that, to be liable for murder, the aider and abettor had to knowingly aid and abet with an intent to kill. That does not implicate a theory of imputed malice, and it actually inures to the benefit of an aiding and abetting principal, but it demonstrates the ambiguity of the aiding and abetting instruction in the implied malice murder context.

The People criticize *Langi* and *Powell*, arguing there is no reasonable likelihood the jury would construe the instruction's reference to *the crime* to mean murder with an

---

[8] In *Coleman*, the court addressed an instructional argument regarding the former crime of assault to commit murder under repealed section 217, which required an express intent to kill. (*Coleman, supra*, 48 Cal.3d. at pp. 137–138.) Among other instructions, the jury was instructed under CALJIC Nos. 8.10 and 8.11, which indicated that murder could be committed with implied malice. (*Coleman, supra*, at pp. 138–139.) When the jury was specifically instructed on the crime of assault with the intent to commit murder under a version of CALJIC No. 9.01, it was directed that the assault for that crime had to be committed with the "'specific intent to commit murder.'" (*Coleman, supra*, at p. 139.) The defendant argued the jury would have believed it could convict the defendant of assault with the intent to commit murder even if it found the defendant acted only with implied malice because murder required malice, which could be with express or implied. The court rejected this claim, pointing out that it is impossible to intend to commit murder without intending to kill. (*Ibid.*)

intent to kill, as *Powell* seems to indicate. Nor, in the People's estimation, is there a reasonable likelihood the jury would construe the instructions to mean the aider and abettor could be found guilty merely because he intended to aid and abet the commission of *a life-endangering act*, as *Langi* indicates.

Rather, the People argue a third interpretation of the instruction consistent with the law. By referencing the other instructions for murder and malice, the People maintain it would have been clear to the jury the crime of implied malice murder does not have an intent to kill requirement, but it does require a life-endangering act coupled with conscious disregard for human life. Thus, the aiding and abetting instruction's reference to the perpetrator's *unlawful purpose* would have been understood as knowledge the perpetrator intended a life-endangering act *with* (at least) implied malice. If the aider and abettor knew the perpetrator's unlawful purpose amounted to implied malice, then the aider and abettor cannot *intentionally* aid and abet the commission of that act without himself personally harboring implied malice. Moreover, the jury would know the instruction's reference to *the crime* in this case meant murder, the only crime charged, and that this crime could involve implied, rather than express, malice. In other words, the jury would understand the aider and abettor did not have to intend the commission of the unlawful killing, but had to intend to commit *an implied malice murder*.

We are unsure which of these three interpretive routes the jury might be more likely to take, but there is a reasonable likelihood the jury interpreted it as *Langi* and *Maldonado* posit. As articulated in *Powell*, *Langi* and *Maldonado*, the pattern aiding and abetting instruction is not well tailored for implied malice murder because the instruction poses a unique dichotomy whereby the aider and abettor has to knowingly and intentionally aid and abet the commission of *the crime* of murder (which necessarily involves an unlawful killing) yet does not necessarily, nor does the direct perpetrator, have to intend to kill. (*Powell, supra*, 63 Cal.App.5th at p. 714; *Langi, supra*, 73 Cal.App.5th at p. 982; *Maldonado, supra*, 87 Cal.App.5th at p. 1266.) Knowingly and

27.

intentionally aiding and abetting the commission of *murder* without an intent to kill is an awkward, counterintuitive formulation, and one a reasonable jury would likely struggle to parse correctly.

Moreover, the instruction does not clarify how to construe the *unlawful purpose* of the perpetrator. The People argue *Langi* misunderstands this phrase to include something less than the specific intent of the perpetrator, but we take *Langi* to articulate how a *jury* may be reasonably prone to understand the phrase in this context.[9] Because the perpetrator does not need to intend the resulting killing in the context of implied malice murder, there is more than a mere possibility the jury would understand the *unlawful purpose* phrase to encompass knowledge the perpetrator means to commit the intentional life-endangering act without knowledge that *the perpetrator* subjectively knows the act is dangerous to life. Moreover, when the life-endangering act *also* constitutes a crime different than murder (like the battery charged in *Langi*, or the uncharged, unlawful act of confronting the victim with a gun in this case), that increases the likelihood the jury would understand both the instruction's reference to the perpetrator's *unlawful purpose* and to *the crime* as referring only to the life-endangering act the perpetrator intended, without regard to whether the aider and abettor personally harbored malice or knew the perpetrator acted with the mental state of implied malice.

In this case, none of the other instructions provided any substantial assistance in resolving the ambiguities. The jury was instructed under CALJIC No. 3.00 that

---

[9]     *Langi* explained that although the implied malice murder instruction made clear the perpetrator had to act with implied malice, "his [unlawful] purpose might have been only to strike or to injure, or conceivably only to embarrass, the victim." (*Langi, supra*, at 73 Cal.App.5th at p. 982.) The subjective motivation of the perpetrator underlying the decision to commit an intentional life-endangering act is not what the aider and abettor has to know with respect to aiding and abetting implied malice murder (*McCoy, supra*, 25 Cal.4th at p. 1118), but in the implied malice context, knowledge of the *unlawful purpose* of the perpetrator might be limited only to the life-endangering act the perpetrator intends (*Reyes, supra*, 14 Cal.5th at p. 991).

28.

"[p]ersons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] 1. Those who directly and actively commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission of the crime." But this did not explain an aider and abettor must have the mental state required for the crime they have aided and abetted.

The jury was also instructed under CALJIC No. 3.31.5 that "[i]n the crime charged in Count One, murder, there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator. Unless this mental state exists, the crime to which it relates is not committed. [¶] In the crime of murder, the necessary mental state is malice aforethought, whether express or implied." Yet, this instruction references the *perpetrator's* state of mind and did not make clear this requirement extends to any principal.

Considering the instructions as a whole, and applying all presumptions the jury is intelligent and able to correlate instructions, there remains a reasonable likelihood the jury construed the aiding and abetting instruction in the manner petitioner, *Langi* and *Maldonado* suggest. We do not need to resolve which of the three proffered interpretations outlined above the jury would have been more likely to gravitate. It is enough that there is a reasonable likelihood, beyond a mere possibility, the jury interpreted the aiding and abetting instruction to mean the aider and abettor must knowingly and intentionally aid and abet only the life-endangering *act* of the perpetrator, and thus convict petitioner of murder by imputing the implied malice of the perpetrator to the petitioner as an aider and abettor.

Under the facts of this particular case, we recognize the unlikely juxtaposition that a jury would conclude the shooter subjectively understood, but consciously disregarded, the danger to life of confronting the victim at loaded gunpoint and shooting such that there would be implied malice to impute to others, while simultaneously being unsure

29.

whether the others who accompanied the shooter to the victim's apartment subjectively understood that danger.  However, evaluating the instruction in light of the evidence the jury considered strays into weighing the facts and circumstances surrounding this particular shooting, which is not appropriate at the prima facie stage.  (*Lewis, supra*, 11 Cal.5th at p. 972.)

Without anything in the record of conviction that conclusively negates the reasonable possibility the jury misconstrued the aiding and abetting instruction by imputing malice to the petitioner, the petitioner cannot be deemed ineligible for resentencing as a matter of law at the prima facie stage.

## DISPOSITION

The trial court's order denying the petition is reversed.  The matter is remanded with directions to issue an order to show cause and hold an evidentiary hearing.